# COURT OF CHANCERY
# OF THE
# STATE OF DELAWARE

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: September 21, 2021
Date Decided: September 22, 2021

A. Thompson Bayliss, Esquire
Adam K. Schluman, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807

Arthur G. Connolly, III, Esquire
Matthew F. Boyer, Esquire
Connolly Gallagher LLP
1201 North Market Street, 20th Floor
Wilmington, Delaware 19801

Jon E. Abramczyk, Esquire
Alexandra M. Cumings, Esquire
Morris Nichols Arsht & Tunnell LLP
Wilmington, Delaware 19801

RE:   *In re: Howard Midstream Energy Partners, LLC*
      C.A. No. 2021-0487-LWW

Dear Counsel:

This decision resolves Petitioners' Motion to Compel. The motion seeks to compel nominal defendant Howard Midstream Energy Partners, LLC (the "Company") to produce certain privileged documents that were prepared at a time when two of the petitioners were directors of the company. The crux of the dispute is whether the petitioners were adverse to the Company and to the respondent directors. The Company, along with the individual respondents, asserts that the petitioners were adverse on all matters concerning the petitioners' separation from the Company. The petitioners, however, argue that their adversity should be

viewed as limited to separation negotiations. After reviewing the parties' submissions and oral argument on the motion, I conclude that the petitioners' construction of the directors' adversity is too narrow. For the reasons explained below, the Motion to Compel is denied.

## I.  BACKGROUND

Howard Midstream Energy Partners, LLC is managed by a six-member Board of Directors pursuant to the Company's LLC Agreement.[1] At the time the members entered into the LLC Agreement, the Company had two management members: respondent J. Michael Howard and petitioner Brad Bynum, the Company's co-founders. The LLC Agreement provided that affiliates of one outside investor ("AIMCo") had the right to designate one director, affiliates of another outside investor ("Alinda") had the right to designate two directors, and an entity jointly controlled by Howard and Bynum ("HBMI") had the right to designate three directors.[2] The three designees of HBMI were Howard, Bynum, and petitioner Scott Archer, who served as the Company's CFO.

---

[1] Verified Pet. for Dissolution Under 6 *Del. C.* § 18-802 and for Relief Under 6 *Del. C.* § 18-110 (hereinafter "Pet.") ¶ 6. (Dkt. 1).

[2] Pet. Ex. A (LLC Agreement) § 6.2; Pet. ¶ 5.

In April 2021, Bynum and Howard began to disagree about how to run the Company. Howard asked that Bynum resign and Bynum initially refused.[3] On April 14, 2021, the Board of Directors formed a Special Committee to "consider, review and evaluate" certain "executive employment and other personnel-related matters relating to [Howard] and [Bynum]."[4] The Special Committee concluded that one of the co-founders should leave the Company and—according to the petitioners—"took sides" to permit a "coup" by Howard.[5] By April 22, 2021, the petitioners had retained their own litigation counsel.[6]

On April 25, 2021, Howard and the Special Committee requested Bynum's resignation as an officer which, under the LLC Agreement, would trigger his automatic removal as a director (the "April 25 Resignation Request").[7] They likewise requested that Archer resign as CFO and a director and that the Company's General Counsel, petitioner Brett Braden, also resign.[8] Bynum,

---

[3] Pet. ¶¶ 9-10.

[4] Pet'rs' Mot. to Compel Ex. 6.

[5] Pet. ¶¶ 14-15.

[6] *See* Company Opp'n to Mot. to Compel Ex. F (petitioners' privilege log withholding documents on grounds of work product protection between the petitioners and counsel at Quinn Emanuel Urquhart & Sullivan, LLP).

[7] Pet. ¶ 16.

[8] *Id.*

Archer, and Braden were unhappy but "expressed interest in negotiated departures that would allow both sides to move on."[9]

From there, the parties entered into separation negotiations that did not proceed smoothly. The Company's in-house counsel—other than Braden—provided advice to the Special Committee, who negotiated opposite to the petitioners.[10] "Howard and the Special Committee made an initial low-ball offer" to the petitioners and then, on May 6, 2021, made their "best and final" offers.[11] The petitioners were purportedly told that if they did not accept those offers, they would be terminated.[12]

On May 25, 2021, Bynum and Archer called a special meeting of the Board to be held on May 27, 2021 (the "May 27 Meeting").[13] The petitioners intended to ask the Board to "reject the Special Committee's recommendation and direct [the] [p]etitioners to return to work."[14] According to the petitioners, on May 26, 2021, Howard secretly entered into an agreement with affiliates of AIMCo and Alinda (which designated the three other respondent members of the Board) to terminate

---

[9] Pet. ¶ 17.

[10] Pet'rs' Mot. to Compel ¶ 12.

[11] Pet. ¶¶ 19-20.

[12] Pet. ¶ 20.

[13] Pet. ¶ 22.

[14] *Id.*

the petitioners while protecting certain financial and governance rights benefitting Howard.[15] The petitioners allege that they were "ambush[ed]" by that secret alliance at the May 27 Meeting.[16] During the meeting, Howard asserted that a "Howard Trigger Date" had occurred under the LLC Agreement.[17] From there, respondent James Metcalfe—a member of the Special Committee—declared himself the chairman of the Board and introduced a series of motions and votes that purported to remove Bynum, Archer, and Braden from their roles.[18]

This action followed. The petitioners filed a petition in this court on June 3, 2021, seeking the dissolution of the Company and a declaration under 6 *Del. C.* § 18-110 that the purported terminations of Bynum, Archer, and Braden were improper because, among other things, a Howard Trigger Date could not have occurred. On June 17, 2021, I entered a Status Quo Order that maintained the composition of the Board as it existed before the disputed May 27 Meeting during the pendency of this action.[19]

---

[15] Pet'rs' Mot. to Compel ¶¶ 15-16.

[16] Pet. ¶ 23.

[17] Pet. ¶ 23. The occurrence of the Howard Trigger Date, as defined in the LLC Agreement, is what purportedly allowed the governance changes voted on at the May 27 Meeting to transpire. Pet. ¶¶ 26-27.

[18] Pet. ¶ 24.

[19] Dkt. 37.

Now, the petitioners have moved to compel the production of certain documents withheld by outside counsel for the Company as protected by the attorney-client privilege and, for certain documents, a common interest privilege between the Special Committee and the Company (including Howard).[20] The documents at issue were created between the April 25 Resignation Request and the May 27 Meeting. The petitioners assert that Bynum and Archer are entitled to the documents because they were directors of the Company during that time. In response, the Company and the respondents assert that the petitioners cannot access the privileged information because they were openly adverse to the Company after the April 25 Resignation Request. The parties agree that adversity was present after April 25, 2021 as far as separation negotiations are concerned. The question is how broadly that adversity should be construed.

## II.   ANALYSIS

The petitioners rely on the general rule that a director's right to access company information is "essentially unfettered in nature."[21] That rule is rooted in

---

[20] Pet'rs' Mot. to Compel. At the petitioners' urging, the Company retained neutral counsel given its status as the nominal defendant in this action.

[21] *Kalisman v. Friedman*, 2013 WL 1668205, at *3 (Del. Ch. Apr. 17, 2013) (quoting *Schoon v. Troy Corp.*, 2006 WL 1851481, at *1 n.8 (Del. Ch. June 27, 2006)).

the principle that board members "are responsible for the proper management of the corporation."[22] The rule applies equally to LLCs and their managers.[23]

The Court of Chancery in *Kalisman* described the three recognized limitations to that general rule. First, a "director's right can be diminished 'by an *ex ante* agreement among the contracting parties.'"[24] Second, the board can form a special committee excluding a director, and that committee "would [be] free to retain separate legal counsel, and its communications with that counsel would [be] properly protected."[25] Third, privileged information can be withheld from a director "once sufficient adversity exists between the director and the corporation such that the director could no longer have a reasonable expectation that he was a client of the board's counsel."[26]

---

[22] *Id.* at *4 (quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 7.02[d] (2012)).

[23] *See Lynch v. Gonzalez*, 2019 WL 6125223, at *10-11 (Del. Ch. Nov. 18, 2019); *see also Obeid v. Gemini Real Estate Edvs., LLC*, 2018 WL 2714784, at *4 (Del. Ch. June 5, 2018) (explaining that a member of an LLC has access to information in the same manner as a corporate director, "[a]bsent validly imposed contractual limitations").

[24] *Kalisman*, 2013 WL 1668205, at *4 (quoting *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 3074444, at *5 (Del. Ch. June 4, 1996)).

[25] *Id.* at *5 (quoting *Moore*, 1996, WL 307444, at *6).

[26] *Id.*

For purposes of the third limitation, adversity is assessed in view of the reasonableness of a director's own expectations.[27] As a result, such adversity cannot be unilateral and without the director's knowledge.[28] "[C]oncealing the existence of adversity may create a reasonable (although mistaken) expectation on the part of a director that he was being treated identically with the other directors . . . ."[29]

Here, there was no *ex ante* agreement limiting the directors' access to information. The special committee limitation is relevant, given the formation of the Special Committee in April 2021. The primary issue, however, is based on the third limitation: whether known adversity existed on matters beyond negotiations about the petitioners' separation terms after the April 25 Resignation Request.

The petitioners "agree that 'open adversity' existed between them and the Company in connection with separation negotiations" after April 25, 2021.[30] But they contend that machinations behind the scenes by the Special Committee members, Howard, and counsel to effectuate that separation—such as on the declaration of a Howard Trigger Date and a "secret agreement" to implement

---

[27] *Id.*

[28] *See In re CBS Corp. Litig.*, 2018 WL 3414163, at *5 (Del. Ch. July 13, 2018); *see also Lynch*, 2019 WL 6125223, at *10-11 & n.123.

[29] *CBS*, 2019 WL 6125223, at *5.

[30] Pet'rs' Mot. to Compel ¶ 39.

governance changes at the May 27 Meeting— are different.  Because those plans were concealed from the petitioners until the May 27 Meeting, the petitioners assert that Bynum and Archer could not have reasonably expected that they were no longer clients of Company counsel and are entitled to related communications.

After considering the parties' submissions and the numerous exhibits included with them, I disagree.  The petitioners are correct that their adversity on separation negotiations did not create adversity on all matters.  But that adversity cannot fairly be viewed as narrowly as the petitioners suggest given the facts of this case.

Even before the Special Committee requested that the petitioners resign, the petitioners were conferring with litigation counsel about "separation negotiations" and the "special committee process."[31]  By April 26, 2021, they were conferring with one another "in anticipation of potential litigation regarding employment termination" and were analyzing the LLC Agreement.[32]  By April 27, 2021, Delaware litigation counsel was involved in those discussions.[33]  The petitioners withheld certain communications during this time period as protected by the work

---

[31] Company Opp'n to Mot. to Compel Ex. F (rows 1-5).

[32] *Id.* (rows 6-36).

[33] *Id.* (row 38).

product doctrine, meaning that they were prepared in anticipation of litigation.[34]

Plainly, the petitioners were considering pursuing complex litigation against the respondents, who are the other members of the Board.

After April 25, 2021, obvious adversity existed between the petitioners (including the Company's General Counsel) on one hand, and Howard, the Special Committee, and other Company counsel on the other hand. The Special Committee had asked that the petitioners resign, and the petitioners agreed, subject to negotiating the terms of their departures. Their adversity does not end with the separation negotiations themselves. The mechanism by which the Board attempted to remove the petitioners at the May 27 Meeting—a meeting the petitioners called—was, until that point, a secret. But the parties' escalating hostility on removal was evident. That is, for purposes of this motion, the petitioners' knowledge of the complex manner of removal is less important than their knowledge that involuntary separation was a possibility. The petitioners therefore had no reasonable expectation that they were a client of the Company's counsel

---

[34] *See Zirn v. VLI Corp.*, 621 A.2d 773, 782 (Del. 1993); *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *3 (Del. Ch. Nov. 13, 2002) (discussing that the work product doctrine is intended to prevent discovery of materials "from an opposing party in litigation" (citation omitted)).

with respect to how they were removed while Howard remained—the very matters raised in this case.[35]

After the Special Committee recommended separation and the petitioners expressed their willingness to leave, the Special Committee members—working with the Company and its counsel—were entitled to continue to engage in privileged communications that excluded the petitioners. On this point, the court's decision in *SBC Interactive* is instructive.[36] There, a general partner seeking to withdraw from the partnership was found to lack a reasonable expectation that it was a client of the partnership's in-house counsel. Then-Vice Chancellor Jacobs explained that the partnership was "entitled to deliberate and receive legal advice in confidence and without having to share that advice with the director[s] whose interests are adverse."[37]

The second limitation described in *Kalisman*—the protection of a special committee's privileged communications from an excluded director—further supports this conclusion. The petitioners acknowledge that the Special Committee was permitted to exclude them from privileged communications. But they argue that the Special Committee's privilege was waived when it involved Howard and

---

[35] *See Kalisman*, 2013 WL 1668205, at \*5.

[36] *SBC Interactive, Inc. v. Corporate Media Partners*, 1997 WL 770715 (Del. Ch. Dec. 9, 1997).

other Company employees in those exchanges.[38]  The respondents and the

Company contend that the Special Committee had a common interest with the

Company in implementing the Special Committee's recommendation.

It seems logical to expect that the Special Committee, charged with

evaluating whether one of the co-founders should leave the Company, would

confer with the Company's in-house counsel.  In *CBS*, this court concluded that a

special committee could withhold communications with company in-house and

outside counsel from the non-committee member directors with adverse interests.[39]

That was so, the court explained, insofar as the matters on which counsel provided

assistance fell within the purview of the special committee.  Here, the Special

Committee's engagement with the Company's in-house counsel (other than

Braden, who was conferring with Bynum and Archer) appears to be within its

mandate of "without limitation, reviewing, considering, evaluating, and making

recommendations regarding . . . any severance arrangements or agreements for

---

[37] *Id.* at *6 (discussing *Moore*).

[38] *See generally* Pet'rs' Mot. to Compel Section IV.

[39] 2018 WL 3414163, at *7 (Del. Ch. July 13, 2018).

executive officers."[40]  The Special Committee, rightly or wrongly, was considering avenues to fulfill its charge.[41]

The inclusion of Howard, the Company's CEO, in those discussions did not cause a broad privilege waiver.  After April 25, 2021, Howard was no longer a subject of the Special Committee's investigation.[42]  And the Special Committee had the power to direct Company officers and employees to cooperate with it "in connection with carrying out the intent and accomplishing the purposes" of its authorizing resolutions.[43]  Given that power, it would be problematic to find that Howard's cooperation caused a privilege waiver entitling the petitioners to those communications.[44]

---

[40] Pet'rs' Mot. to Compel Ex. 6.  The Special Committee was also permitted to perform "any necessary or appropriate" activities "consistent with its charter." *Id.*

[41] The petitioners point out that the Special Committee's charter requires it to make a recommendation to the Board, which had not occurred before the respondents took action at the May 27 Meeting.  That may be true.  But whether the Special Committee was acting in furtherance of its recommendation before then does not change the reality that the petitioners were adverse and had no reasonable expectation of being included in the Special Committee's privileged deliberations.

[42] *Compare Ryan v. Gifford*, 2007 WL 4259557, at *3 (Del. Ch. Nov. 30, 2007) (ordering the production of privileged materials after disclosure to directors under investigation).

[43] Pet'rs' Mot. to Compel Ex. 6.

[44] *See CBS*, 2018 WL 3414163, at *7 ("It would make no sense to direct these persons . . . to cooperate fully with the Special Committees only to expose to an adverse party what they shared with the Special Committees.").

Ultimately, by April 25, 2021, a gulf had opened between the petitioners and the respondents. Bynum and Archer were still directors of the Company, but (until the May 27 Meeting) had agreed to leave if the terms were right. They, along with Braden, were being advised by litigation counsel. On the other side, Howard, the Company, and its counsel (other than Braden) were engaged in talks about how to remove the petitioners. Regardless of whether the Special Committee and the Company took a proper approach to effect the petitioners' removal—which remains to be determined—the adversity between the factions of directors is undeniable. Bynum and Archer had no reasonable expectation that they were entitled to Company privileged communications about any matters related to their separation between the April 25 Removal Request and the May 27 Meeting.

Accordingly, the Motion to Compel is DENIED. To the extent necessary to implement this decision, IT IS SO ORDERED.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

cc: All counsel of record (by *File & ServeXpress*)